UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CIVIL CASE NO.: 22-civ.-2367

------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,    :
:
                                Plaintiff,    :
:
  -- against --    :
:
ANTHONY MICHAEL HERNANDEZ and    :
OI2GO MEDIA TECHNOLOGIES, INC.,    :
:
:
                             Defendants.    :
------------------------------------------------------------------------x

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF
AND DEMAND FOR JURY TRIAL**

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Anthony Michael Hernandez ("Hernandez"), and Oi2Go Media Technologies, Inc. ("Oi2Go" or "the Company" and collectively, "Defendants") alleges as follows:

**SUMMARY OF ALLEGATIONS**

1. On or about July 23, 2018 Hernandez conducted a public offering of Oi2Go's stock pursuant to Regulation A [17 C.F.R. §§ 230.251-230.263] ("Reg. A") under the Securities Act of 1933 ("Securities Act") through a "Form 1-A" offering statement (the "Offering Circular").

2. Subsequently, Hernandez created a nationwide television ad that hyped Oi2Go's public offering. In the television ad, Defendants knowingly, severely or extremely recklessly disseminated materially false and misleading statements to promote the unregistered offering to prospective investors. At all times, the TV ad presented Oi2Go as an "American-Latino Streaming Platform" giving the appearance of a functioning media company poised for subscription growth. The ad opens by telling

investors to imagine if they had invested in Amazon, Facebook and Netflix when they were launched. It goes on to say "Oi2Go is being touted as the American-Latino centric version of Netflix." It also states "Oi2Go is the premier home and mobile OTT [over-the-top] platform for movies, TV and radio, catering to American Latinos everywhere."

3.      Oi2Go and Hernandez made similar representations in a Roadshow Deck which was available to investors on a marketing firm's website retained by Hernandez to assist with the offering.

4.      Oi2Go was in fact a start-up company with no functional streaming service as it lacked the technology to deliver such service.

5.      Through this fraudulent conduct, by August 2019 defendants obtained approximately $1,317,000 from the sale of Oi2Go securities to approximately 750 investors. Hernandez misappropriated over 33% of the $1,317,000 raised from the Oi2Go investors as he used at least $456,000 to pay numerous personal expenses.

6.      From August 16, 2018 through at least March 2019, Hernandez and Oi2Go failed to meet Reg. A's requirement of simultaneous delivery of the Offering Circular with the Oi2Go TV ads as the offering circular was not and could not be delivered to viewers in this medium. The failure to do so deprived investors of critical material information regarding Oi2Go's lack of operational status. Moreover, the TV ads were the primary method used by Oi2Go to promote the offering.

7.      Hernandez and Oi2Go also failed to comply with Reg. A because they failed to file with the Commission periodic and current reports, including annual reports under Rule 257(b)(1) of Reg. A. Oi2Go, which had a fiscal year ending in December 2018 should have filed a Form 1-K with financial statements for FY2018 by April 30, 2019 which it failed to do but continued to sell securities to investors beyond April 30, 2019.

8. Additionally, from August 2018 through at least February 2019, Defendants hired unregistered brokers as sales agents who worked in an investor call center for the Oi2Go securities offering.

9. Hernandez engaged an external marketing firm to produce the TV ad and to hire the sales agents. These agents were paid commissions on their securities sales.

10. Hernandez and Oi2Go attempted to evade broker-dealer registration requirements by mischaracterizing the nature of the Oi2Go sales agents as the offering circular states "commissioned brokers" were not engaged.

## DEFENDANTS

11. **Hernandez,** age 52, resides in Orlando, Florida. He was the CEO and Director of Oi2Go.

12. **Oi2Go** is an Orlando, Florida based media-company formed in July 2017. It was inactive from January 2019 until March 2022 when the company was reactivated with the Florida Secretary of State.

## OTHER RELEVANT ENTITIES AND INDIVIDUAL

13. **Oi2 Media Corp**., was an Orlando, Florida media-company formed in 2015 and was an Oi2Go affiliate. The company was deactivated in 2019.

14. **Carl V. Dawson ("Dawson")**, age 44, is a resident of Calabasas, California. He is the founder and control person of VC Media Partners LLC ("VCMP") and America's Next Investment ("ANI").

15. **VCMP** is a Woodland Hills, California, corporation formed in 2017 by Dawson, to provide various services to issuers engaged in securities offerings and operates a website called vcmediapartners.com. VCMP was retained by Hernandez and Oi2Go to provide a range of services

related to Oi2Go's Reg. A offering, including producing a TV ad, arranging for TV air time, and staffing and supervising a call center of sales agents.

16. **ANI** is a Woodland Hills, California marketing company formed in 2018 by Dawson and operates a website called americasnextinvestment.com, which promoted Regulations A and D offerings for various issuers. The Oi2Go offering was featured on ANI's website which included Oi2Go's TV ad and Road Show Deck.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

17. The Commission seeks a final judgment: (a) permanently restraining and enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge or return ill-gotten gains or unjust enrichment pursuant to Exchange Act Sections 21(d)(3), (5) and (7) [15 U.S.C. §§ 78u(d)(3), (5) and (7)] and pay prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently barring Hernandez from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2); and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

18. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a); and Sections 21(d), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d), (e) and 78aa(a).

19. The Court has personal jurisdiction over Defendants, and venue is proper in the Middle District of Florida because, among other things, the Defendants reside or were based in this District and many of Defendants' acts and transactions constituting violations of the Securities Act and Exchange Act occurred in the Middle District of Florida.

20. In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, and the mails.

## FACTS

**A.      Oi2Go's Reg. A Securities Offering**

21. Oi2Go's Offering Circular, initially filed on February 28, 2018, described its business as "an American-Latino centric version of a 'Netflix' that also adds music and radio." Its plans, which would depend on the success of the offering, were as follows:

> Oi2Go looks to provide Direct-To-Consumer Content Subscription and On Demand Content Services. To this end, the Company looks to the successful completion and launch of our Company's own content software application utilizing the funds from this Offering. We plan to engineer the Oi2Go branded application be a full cross-platform accessible software application that will be made available on most mobile devices, media enabled set-top boxes and connected devices, as well as, other available distribution outlets in an effort to accommodate various consumer behaviors as it relates to content consumption.

22. The Offering Circular as a whole makes clear that the company (with $0 in operating expenses and $170 in cash) was very much non-operational and aspirational. The Plan of Operations section of the Offering Circular states: "Management of the Company intends to use a substantial portion of the net proceeds for general working capital and, once certain funding milestones are met, to move into full implementation to launch our app, purchase and create content, marketing efforts, entering in new markets, and making strategic alliances."

23. In the Use of Proceeds section of the Offering Circular, the Company states:

Ultimately, management of the Company intends to use a substantial portion of the net proceeds for general working capital and, once certain funding milestones are met, to move into full implementation to secure the final location where we will establish our lab, undertake setting it up and then immediately commence full blown research and development activities. <u>The Company plans to develop its app</u>, content for the app, marketing efforts, entering into agreements with talent and celebrities." (Emphasis added.) Consistent with the above, the Company could not provide any trend information "Because we are still in the startup phase and have only recently launched the Company, revenue or expenses since the latest financial year [sic]."

24. After Oi2Go's Offering Circular was qualified by the Commission on July 23, 2018, the Company began offering non-voting common shares to the public at $10 per share, with the goal of selling 5,000,000 shares. Oi2Go began receiving investor funds through the offering in September of that year. The offering was promoted heavily using materials—primarily a TV ad that aired nationally, and was also available in video form on the internet—that painted a different picture of the company than did the Offering Circular. Oi2Go and Hernandez raised approximately $1,317,000 from approximately 750 investors in the offering.

**B.    Hernandez and Oi2Go Made Material Misrepresentations and Omissions in the TV Advertisements Regarding its Content Streaming Platform and Digital App**

25. Oi2Go's TV advertising was the primary means through which it sought investors.

26. An internal document maintained by ANI reflects that 66% of investors identified the TV ad as the source of their referral.

27. Hernandez reviewed and approved the TV ad.

28. The TV ad presented Oi2Go as an "American-Latino Streaming Platform" giving the appearance of a functioning media company poised for subscription growth. The ad opens by telling investors to imagine they had invested in Amazon, Facebook and Netflix when those services were launched. It goes on to say "Oi2Go is being touted as the American-Latino centric version of Netflix." It also states "Oi2Go is the premier home and mobile OTT [over-the-top] platform for movies, TV and radio, catering to American Latinos everywhere." Throughout the ad, people are depicted viewing

6

various smart devices, including a scene with a family gathered around a large screen TV about to watch something with the Oi2Go logo on the screen. The ad closes with the company's logo over the words "TV SHOWS & MOVIES – ANYTIME, ANYWHERE."

**C.     Hernandez and Oi2Go Made Material Misrepresentations and Omissions in Oi2Go's Roadshow Deck Regarding its Content Streaming Platform and Digital App**

29.     Oi2Go also prepared a Roadshow Deck. The Roadshow Deck was placed on ANI's website, where the Offering Circular was also available to prospective investors. Unlike the Offering Circular, the Roadshow Deck was a 25-page power point filled with images and statements about the company.

30.     The Roadshow Deck gave the appearance of a functioning business with the ability to stream American-Latino content through its digital app.

31.     The Offering Summary in the Roadshow Deck provides a curtailed explanation of the Use of Proceeds, omitting any mention of the need to develop its software application.

32.     A chart in the Roadshow Deck labeled "Competitive Advantage" compares Oi2Go with Netflix, Hulu, YouTube, Amazon and other similar companies based on 14 criteria, with Oi2Go being the only one to have all 14 boxes checked. The first box is "Significant Mobile Presence." Another box—with Oi2Go being the only one having this advantage—was "Live TV." And Oi2Go and YouTube were the only ones marked as having "User Generated Content."

33.     The Roadshow Deck also made the following claim with a picture of a couple sitting in a living room watching a TV with the Oi2Go logo on it: "Oi2Go is continuously entering into licensing agreements to distribute the latest premium Hollywood films and next-day television shows. With on demand access, Users can instantly stream content to all of their compatible devices, whether at home or on the go." These statements were false.



34. A page in the Roadshow Deck entitled "Revenue Streams" lists advertising revenue, subscription revenue, live event revenue, licensing revenue, and "Transactional PPV-VOD" revenue. All items are discussed in present tense (e.g., "We work with many of the world's largest advertising networks and agencies and major brand sponsors to monetize our platform's advertising-funded business model;" "Premium subscribers have access to our premium channels…."; "Oi2Go generates material revenue from the sale, via VOD…of mostly premium Hollywood films…."), except one ("We will generate revenue from the sale of tickets to live events"). These statements about revenue were false.

35. The last page of the Roadshow Deck provides investors with the following reasons to invest:



These statements were false.

### D. Hernandez Misappropriated Oi2Go Investor Funds

36. The Offering Circular disclosed that, as of the date of the filing, "OI2GO has one full-time employee, Mr. Anthony Michael Hernandez who is not currently receiving a salary." It also stated that "[t]he number of business and direct research personnel hired by Oi2Go will scale based upon funds raised in the offering and as operating needs warrant." Accordingly, the Use of Proceeds section provided a range of anticipated salary costs (depending on the success of the capital raise), with the lowest being $625,000 if Oi2Go raised $5 million.

37. While not receiving a formal salary, Hernandez simply used Oi2Go's investor proceeds as an opportunity to fund personal expenses.

38. Defendants raised approximately $1,317,000 from stock sales.

39. Hernandez spent approximately $338,000 to develop the digital app.

40. Hernandez spent approximately $488,000 of the offering proceeds to conduct the offering itself which included payments to VC Media, sales agents, audit fees, and counsel.

41. Hernandez misappropriated approximately $456,000 of investor funds to pay his personal expenses. For example, he used investor money to pay American Express bills -- which included

personal charges -- totaling $142,000, and to pay approximately $26,000 for expenses related to his divorce and child support payments.  He also withdrew approximately $100,000 in cash through wire transfers, bank teller withdrawals and ATM withdrawals.  Hernandez also used bank account debit cards for Oi2Go and Oi2 Media Corp., an affiliate, as personal expense cards, with approximately $160,000 being used for his purchase of meals, coffee, gas, personal travel and retail store purchases.  Hernandez further made jewelry purchases totaling $10,000 at stores such as Cartier.  Finally, he made transfers via Zelle to his girlfriend totaling at least $18,206.

42. The expenses referenced in paragraph 41 were not in compliance with the terms of the Offering Circular.

**E.** **Oi2Go Used TV Ads and Unregistered Brokers to Sell Its Stock**

43. Oi2Go hired Dawson and his entities to produce TV ads promoting the offering.  The ads were focused not on Oi2Go's business, but on the securities offering.  The ad opened with the line: "Imagine if you had invested with Amazon's IPO stock in 1997…."  Throughout the running of the ad, a scrolling banner across the screen read "Oi2Go – American Latino Streaming Platform - Become an Owner - $10 A Share – Investment Opportunity, Anyone Can Invest."

44. Although the ad contained a disclaimer (in small print, and not visible for very long) informing viewers that Oi2Go had a qualified Reg. A offering circular on file with the Commission, the TV ad did not deliver the offering circular to the viewers—something that is impossible to do in a broadcast TV ad that cannot provide a live hyperlink.

45. Rule 251(d)(1)(iii) of Reg. A under the Securities Act requires any written offers made after the offering statement has been qualified to be accompanied with or preceded by the most recent offering circular filed with the Commission for such offering.[1]

46. Oi2Go's TV ad therefore did not and could not comply with Reg. A's requirement that the offer must be accompanied with or preceded by the offering circular.

47. Visible throughout the duration of the ad was an 800 telephone number and the words "CALL NOW" above the words "DISCOVER INVESTMENT OPPORTUNITIES." People who called the number in the ad were then placed in the hands of a team of sales agents, arranged for by Dawson.

48. Dawson found and trained the sales agents, and provided them with physical offices to use for a call center. Although the sales agents were hired and paid directly by Oi2Go, the arrangement was superficially intended to avoid Dawson, his entities, and the sales agents being deemed unregistered brokers.

49. Oi2Go's Offering Circular stated that the company would distribute shares in reliance on Exchange Act Rule 3a4-1, which provides a safe harbor for an issuer's associated persons to participate in the sale of the issuer's securities without being deemed brokers.

50. However, the sales agents recruited by Dawson received commissions from Oi2Go in addition to a fixed salary—an arrangement provided for in an August 2018 addendum to Oi2Go's engagement letter with VC Media and Dawson. The agents' only role with respect to Oi2Go was handling Oi2Go's securities offering, with no expectation of additional employment beyond that.

51. The passage in the Offering Circular that stated that Oi2Go was relying on Rule 3a4-1 also stated that the Company was not engaging commissioned brokers and would supplement its filing if

---

[1] Under Securities Act Rule 405, "a written communication is any communication that is written, printed, *a radio or television broadcast*, or a graphic communication as defined in this section." (Emphasis added.) 17 C.F.R. § 230.405.

it engages "commissioned sales agents or underwriters." Oi2Go filed its original VC Media engagement letter with the Commission, but never filed the August 2018 addendum that provided that the Company would separately pay "$2000 per month/2% commission" as sales fees to those agents.

52. The sales agents' only function was answering investor calls and following up on investor leads.

F. **Oi2Go Failed to Update its Financial Information With the Commission**

53. Both Oi2Go's Form 1-A Offering Statement (qualified on July 23, 2018) and its post-qualification Offering Circular (dated August 30, 2018 and filed on August 31, 2018) provided investors with financial statements as of year-end 2017.

54. The August 30, 2018 Offering Circular was the Company's last filing with the Commission.

55. Under Reg. A, the Company was required to file with the Commission periodic and current reports, including annual reports under Rule 257(b)(1) [17 C.F.R. § 230.257(b)(1)] of Reg. A. Further, Rule 251(d)(3)(i)(F) [17 C.F.R. § 230.251(d)(3)(i)] of Reg. A specifies that securities may be sold in a continuous offering only if the issuer is current in its annual and semiannual filings pursuant to Rule 257(b), at the time of such sale.

56. Oi2Go, which had a fiscal year ending in December, should have filed a Form 1-K with financial statements for FY2018 by April 30, 2019. However, it continued to sell securities to investors as late as August 2019.

G. **Hernandez Promises Oi2Go Investor Refunds**

57. Hernandez sent a letter to investors in 2022 stating that Oi2Go had become insolvent at the beginning of January 2019.

58. On March 21, 2022, Hernandez emailed a settlement letter to Oi2Go investors promising to refund their principal plus payment of a 20% "inconvenience fee." While Hernandez stated in the letter that the Company had become insolvent back in 2019, he further claimed he would be in a position to refund the investors in May 2022 because "Oi2Go Media Technologies, Inc. is happy to announce that it has entered into a deal with a media venture company to sell the rights and intellectual property and technologies built by the capital funds raised during the company's REG-A+ offering. The letter further stated "this event will undoubtedly trigger your imminent refund of capital provided to the company by your participation in such."

59. Hernandez had no reasonable basis on which to make the promises in the March 21, 2022 settlement letter, and in fact did not make such refunds.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Both Defendants)

60. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 – 42 and 57 – 59 of this Complaint.

61. By engaging in the acts and conduct described in this Complaint, Defendants, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities of Oi2Go, knowingly, or severely or extremely recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

62. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert,

violated, are violating, and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### (Against Both Defendants)

63. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 – 42 and 57 – 59 of this Complaint.

64. By engaging in the acts and conduct described in this Complaint, Defendants, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce or the mails, in the offer or sale of securities of Oi2Go, have: (a) knowingly, or severely or extremely recklessly, employed devices, schemes, and artifices to defraud; (b) knowingly, severely or extremely recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; or (c) knowingly, severely or extremely recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Oi2Go.

65. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate Sections 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)].

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violations of Sections 17(a)(2) of the Securities Act
### (Against Hernandez)

66. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 – 42 and 57 – 59 of this Complaint.

67. By engaging in the acts and conduct described in this Complaint, Defendant Hernandez

directly or indirectly, singly or in concert, provided knowing, or severely or extremely reckless, substantial assistance to Oi2Go which, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale of securities of Oi2Go, has obtained money or property by means of one or more untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

68. By reason of the foregoing, Hernandez, directly or indirectly, singly or in concert, violated, is violating, and, unless restrained and enjoined, will continue to aid and abet violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**
**(Against Hernandez)**

69. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 – 42 and 57 – 59 of this Complaint.

70. By engaging in the acts and conduct described in this Complaint, Defendant Hernandez directly or indirectly, singly or in concert, provided knowing, or severely or extremely reckless, substantial assistance to Oi2Go and others, which, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities of Oi2Go made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71. By reason of the foregoing, Defendant Hernandez aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting Oi2Go's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### FIFTH CLAIM FOR RELIEF
**Unregistered Offering or Sale of Securities in Violation of
Sections 5(a) and (c) of the Securities Act
(Against Both Defendants)**

72. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 – 56 of this Complaint.

73. By engaging in the acts and conduct described in this Complaint, Defendants, directly or indirectly, singly or in concert, (i) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or for delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities, as to which no registration statement was in effect; or (iii) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed. The shares of Oi2Go Media Technologies, Inc. that Defendants offered and sold as alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

74. By reason of the foregoing, Defendants have violated, and, unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

### SIXTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Section 15(a)(1) of the Exchange Act
(Against Both Defendants)**

75. The Commission realleges and incorporates by reference Paragraphs 1 – 24 and 43 – 52 of its Complaint.

76. By engaging in the acts and conduct described in this Complaint, Oi2Go and Hernandez provided knowing and substantial assistance to Dawson, VC Media, and ANI, who made use of the mails or other instrumentalities of interstate commerce to effect transactions in, or to induce or to attempt to induce the purchase or sale of securities while not registered with the Commission as brokers or dealers or not associated with an entity registered with the Commission as a broker-dealer.

77. By reason of the foregoing, Defendants Oi2Go and Hernandez aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting, Dawson, VC Media, and ANI, violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief, in a Final Judgment:

### I.

Finding that Defendants violated the federal securities laws and rules as alleged against them here;

### II.

Permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)] by selling securities while violating the terms of Reg. A under the Securities Act;

**III.**

Permanently restraining and enjoining Defendants and each of their agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), by, directly or indirectly, making any false or misleading statement, or disseminating any false or misleading documents, materials, information, or advertising for investors, and other communications with the investing public, or by engaging in a device, artifice, or scheme to defraud, or to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser, involving the making or dissemination of false or misleading information about any company whose securities Defendants are selling;

**IV.**

Permanently restraining and enjoining Defendants and each of their agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, by, directly or indirectly, making any false or misleading statement, or disseminating any false or misleading documents, materials, information, advertising for investors, or other false or misleading communications with the investing public, or by engaging in a device, artifice, or scheme to defraud or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any purchaser, involving the making or dissemination of false or misleading information about any company whose securities Defendants are selling;

**V.**

Permanently restraining and enjoining Defendants, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of

the injunction by personal service or otherwise, and each of them, from future violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o] by inducing or to attempt to induce the purchase or sale of securities while not registered with the Commission as brokers or dealers or not associated with an entity registered with the Commission as a broker-dealer.

### VI.

Permanently barring Hernandez from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

### VII.

Ordering Defendants to disgorge all ill-gotten gains from the conduct alleged in this Complaint pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (d)(5) and (d)(7)], and to pay prejudgment interest thereon;

### VIII.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

### IX.

Granting such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury as to all issues so triable.

Dated: December 20, 2022
New York, New York

By: *Christopher J. Dunnigan*
Christopher J. Dunnigan
Thomas P. Smith, Jr.
Adam Grace
Yitzchok Klug
Kenneth V. Byrne
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0061 (Dunnigan)
Email: dunnigancj@sec.gov